Good morning. My name is Ben Coleman and I represent Mr. Ha. I'll continue with the theme of the morning of bias adjudicator and I'd like to start with the bias juror claim in this case. Okay. Assuming but not conceding that plain error review applies in this case, we believe that we've established the plain error test and that reversal for new trial is required. And what I'd like to do is start off with the back end of the plain error test, which is the third and fourth prongs of the plain error test, which is whether substantial rights have been affected and whether the fairness, integrity, and public reputation of the proceedings have been affected. And this court has clearly held that, and I'll use the word clearly because I think it is clear, that the seating of a biased juror is a structural error. This court has held that seating in bank and has held it multiple times since then. And this court has also clearly held that a structural error automatically satisfies the third prong of the plain error test. So we don't believe that that prong is at issue. With respect to the fourth prong, this court has also said that it's hard to imagine that a structural error would not satisfy the fourth prong of the plain error test. And we've also cited some authority that says no court has ever held that a structural error does not satisfy the fourth prong of the plain error test. And it's our position that the seating of a biased juror squarely fits under the fourth prong, which is whether the public reputation or the fairness or the integrity of the proceedings has been implicated. So we believe the third and fourth prongs are satisfied, and really all that's at issue here are the first and second prongs, which is whether there was error and whether it was plain. It's our position that in this case, the juror flatly admitted that he would be partial. Upon repeated questions, he continued to say that his personal family experience would affect his ability to gauge the case, and that without anything more, without any rehabilitation of the juror, without any comment from him later saying, well, I could set that aside and be impartial, that this is just simply a plain error. Kennedy. Well, the question is, this record pretty well demonstrates the nature of the bias, doesn't it? Yes, it does. Does that matter? I believe that it does. If the record is plain, if it's clear that the juror was biased, that he said he would be partial, that he said that his family experience would affect his ability to gauge the case, I believe that that's the end of the matter. There needs, without any subsequent rehabilitation of that juror, without him ever declaring that he could put his personal situation aside and be impartial, that that's it, it's a plain error. And the fact that the defense attorney didn't object, that's why we're here on the plain error review, assuming it's plain. There are certain structural errors that simply the judge has a sua sponte duty to correct, and the judge didn't do it in this case. The government didn't rehabilitate the juror. The juror shouldn't have sat on the juror. Why can't we interpret his comments as meaning he would be biased against a pharmacist if this were a case involving an incorrectly filled prescription, but this has nothing to do with that? Well, I believe that he actually specifically said, I would be partial. I understand that this is a fraud case, not a, I can use exact words, he said. I understand this doesn't involve a life-threatening situation, but he still said I would be partial. And then when the judge followed up with him again after that and said, well, would this affect your ability to decide the case, he then again said, yes, it would. Apparently it didn't strike the judge that that's what he was talking about, and it didn't strike defense counsel that that's what he was talking about. And not only that, but then when it came to peremptory strikes, defense counsel struck other people and chose to leave this guy on. Well, with respect to the peremptory, the Supreme Court has created an unusual rule, and that is that you have to let the juror sit to maintain a juror-biased claim. So I don't think the peremptory issue is as much the issue. I admit it's obvious, it's clear that the defense attorney did not move to strike him for cause. It's our position. Or for no cause. Or for no cause. For whatever reason, they wanted this guy on the jury. Well, I don't know whether they wanted him on or they just didn't, weren't paying attention. I know sometimes court here can be a sort of a frenetic pace where you're trying to write down as much as possible and you're looking at all the jurors in the courtroom. I don't know whether it was a strategic choice or whether it was just inadvertence. But we're not here on ineffective assistance claim. We're here on a plain error, assuming it's plain error review, of a structural error in this case. And I just don't simply see how the judge or anybody, given the answers, could have not felt it was a big deal. The judge went back at the juror multiple times, and the juror didn't waver. The juror said it would affect it multiple times. And in another context, the juror also had a couple other personal situations. He had a prior conviction. And the judge asked the juror, would that affect your ability to handle the case? And he said, no, it wouldn't affect it. And there's also another portion of the board here where I think this juror had been the victim of a mail theft, and the judge asked the juror, would that affect your ability to weigh the case? He said, no, it wouldn't affect it. So this juror understood the questions, was clear, never wavered, and said, I would be partial. It would affect it. It would affect it over and over again. And it's just an error. Sometimes these things happen. This was a situation where the judge had to continue further inquiry if this juror was to sit. I don't think the judge ever would have been able to rehabilitate the juror because he was pretty clear that he would be partial. His sitting, though, you see, was not inadvertent. The judge knew the bias, and he knew the nature of the bias. Defense counsel knew the bias, and defense counsel knew the nature of the bias. Everybody knew. Their spin on it differs from yours, and that's about the status of this case, isn't it? I don't think so. I don't think we don't have a situation here where the judge said, I understand that this guy says he's being biased, but I don't think it's really a big deal. Or where the defense attorney or the prosecutor said, I understand this guy says he'll be partial, but he's just making something up or it's not clear. We don't have that here. We have specific answers to specific questions and no contrary interpretation by anybody in the record. And it's whatever everybody else thought, the bottom line is that these errors are so significant that it constitutes a structural error. These are simply the type of errors that, whatever everybody else is thinking, this Court has held, require reversal. And I don't think there's any other way to read the record. I don't think the government necessarily characterizes it that way in their brief. They just, they say that, they point out that the defense attorney didn't object, and I acknowledge that. The defense attorney didn't object. If there are no other questions, I'll save the remaining time for rebuttal. Thank you. Thank you. Oh, the Santos issue? Yeah. I'll briefly comment on that. The Supreme Court's decision in Santos, at least in my opinion, is a little hard to understand. We have a 4-1-4 decision, and this Court in Van Alstyne has tried to give some clarity, at least for this Court's jurisprudence, as to how Santos should apply. It's our position that, at the very least, I think it counts 25 through 29 should be reversed. Those are money-laundering convictions that involve payments of the proceeds, however you want to define that, but payments to Mr. Ha's co-defendant. And it's our position that both of them. Can you pronounce his name? What's the co-defendant's name? It's a woman, and I'm sorry. It's H-O-A-G. I don't know how to pronounce it. I was not the trial attorney, so I'm not quite sure how. All right. Then you can't help me. Okay. I don't know how the pronunciations are, but her name is Huang, Huang maybe. Those we believe that both the Supreme Court and this Court have said that distribution of loot to Confederates, to co-defendants, that that's the type of thing that is, I guess, a receipt. It's an expense. It's an inherent part of a fraud scheme and that those are the types of payments that result in a merger problem and, therefore, to not be subject to the money-laundering statute. Is she a co-owner of CARE? I believe that was the testimony of trials, that she was a co-owner. In which case, she's just taking her share of the proceeds. She is. And we believe that as to Mr. Ha, that would be, at least as to Mr. Ha, that even though she is a partner, a co-conspirator, a co-owner, however you want to define it, that that is a receipt to him. It's an expense to him. And at the very least, those counts should be reversed. I guess the flip's, then it's debatable about whether the payments to himself would be proceeds or not. And, frankly, the law, I don't believe, is very clear one way or the other. But at the very least, we think that those four counts or five counts, whatever they are, 25 through 29, should be reversed. This is immensely confusing. But if I understand what you're saying is arguably when he pays himself, that would not be, it would not implicate the merger problem. But if he pays somebody else, that would be a cost of doing business that would implicate the merger problem.  I'm not conceding that his own payments are. But I think it's much clearer with respect to the payments to somebody else than it is with respect to the payments to himself. I mean, the bottom line in this case is the concern with Santos and Van Alstyne is this merger problem, which is basically like double punishment for the same conduct. And the reality is that this was a fraud case. And essentially the money laundering counts are double punishing for. Well, in one sense, I see what you're getting at. In another sense, the money went into the Haas Pharmacy bank account, right? Correct. And then it gets transferred from that bank account into Haas' personal bank account. Correct. That's the kind of thing that the money laundering statute is designed to address so you can't disguise the money. Arguably, although I don't know if there was much disguising here. It just went to the pharmacy. They may not have been very good at it. But that's what the idea is. You can't ship the money from one account to another account to another account. That's what distinguishes money laundering from just taking the money and leaving the bank, you know. Correct. So if that's the case, I don't see how it makes any difference whether the money goes from the pharmacy account to Mr. Haas' account or the pharmacy account into Ms. Huang's account. It's the same problem, it's just a different account. Well, I'm just going by the language. I don't know if it's very clear. But the language in both Santos and in Van Alstyne says that if there are payments to a co-conspirator, that as to the defendant, those payments would not be profits. They're basically expenses, and therefore they don't fall under the money laundering statutes. I don't know whether there's necessarily a principal distinction between the defendant himself and his co-conspirator and why it should matter, but that's just what the language of the opinions say. I mean, obviously this is an area of the law that is not going to be confusing for very long, because Congress has already amended the money laundering statute. So there's just going to be a finite group of cases that are pending on appeal under the old money laundering statute. And frankly, because everything is so unclear, I just think under the rule of lenity, particularly in a case like this, when there are separate fraud convictions, rather than double punishing somebody for both money laundering and fraud, there's no reason why just the fraud convictions couldn't stand and the money laundering convictions could be vacated. But in any event, it's obviously our position that there should be a new trial on all the counts based on the jurors. I'll stay with you on that. Thanks, Mr. Coleman. Morning. Morning, Your Honor. May it please the Court, Lawrence Cole for the plaintiff and appellee in the United States of America. Your Honors, in the Jermaine Mitchell case, one of the cases that the parties spent a great deal of time discussing, and one of the main authorities that the defendant relies on, the Court said that there is a critical distinction between situations where there is a challenge for cause that the Court did not allow and a situation like this one where counsel chose, knowingly, to let the juror sit on the jury. And the Court said, the Ninth Circuit said there, in most situations, the wadir should suffice to identify juror bias and that challenges for cause are the means by which biased jurors are to be eliminated. In the Jermaine Mitchell case, this Court said that the Court inquired about bias. As here, the Court asked this juror questions. The parties had a chance to follow up. That's what happened here, too. The parties had a chance to ask questions of this and other jurors, and that a lack of challenge shows that the parties were satisfied with what they heard. The Court, this Court there said that it must be significant that no one challenged for cause, no one got more information, and no one used a peremptory. That is exactly what happens here. Mr. Ha's counsel, unfortunately, trial counsel, is not here today to talk about what he was thinking at the time, but as Your Honors pointed out during the beginning of the argument, it is quite possible, indeed likely, that he had tactical and strategic reasons for deciding he wanted that juror on the jury. That juror was a convicted criminal. That might have been a reason that he felt it was worthwhile to have him on the jury. And let's remember that counsel for Mr. Ha asked questions about the voir dire process. He did challenge for cause. This isn't a situation where counsel is unaware, didn't realize or didn't act on his ability to challenge for cause. In fact, he did so. He challenged another juror for cause for bias, the exact issue raised here, and the judge granted it. There's absolutely no reason to think that Mr. Ha's counsel at trial thought he couldn't or was not able to or would not be listened to if he challenged this juror, if he thought this juror was biased. And even if for some reason he did not, actually, before I move on, I should note, it wasn't just counsel for Mr. Ha, counsel for the government, me. I also challenged jurors for cause as well, some of which were granted, and the judge on her own raised with us questions about jurors who might not be appropriate to be seated. So there was an extensive discussion at which jurors, several jurors were challenged and excused for cause. The judge then gave the parties their slate of peremptory challenges, and the defense used them and used all of them. So once again, even if counsel thought for some reason he didn't want to raise the cause issue, didn't want to flag it, he had ample opportunity to challenge with a peremptory challenge, and he chose not to. Your Honors, in discussing what the juror actually had to say, I think the Court correctly noted that what the juror was explaining, he was asked over and over again, how would this affect you? He never said it would have any effect on him in regard to a situation like this case. What he kept saying was the effect was when he goes to get prescriptions filled, he's careful when he deals with the pharmacist. That wasn't what he was doing sitting in court as a juror, and it wasn't what the case was about. The case didn't charge Mr. Hobb with being an incompetent pharmacist. In fact, Mr. Hobb wasn't even a pharmacist. He was a pharmacy owner. It charged him with billing fraud, and this juror expressed not a single thing that showed he had any bias on a fraud matter, on a matter involving billing. And in fact, when you look at the – the Court needs to take the statements in their context, and the transcript does say, I would be partial. However, he followed that up with what's essentially a non sequitur if he really said the word partial. He said, well, this involves – that was more of a life-threatening situation, that this involves something that's monetary. Do you think he meant to say impartial? Your Honor, I actually think he did say impartial. And although it's – it was – there's nothing in the record that I can cite to. We checked with the reporter to see if she still had the audio tape. Unfortunately, she did not, so I was not able to go back and listen to it. But when you look at what he followed it up with, and you look at the fact that Judge Stotler, a judge with decades of experience, a former chief judge of the district, a very, very careful judge, that she didn't follow that up by saying, would you really be partial? Not to mention the fact that that's just not the way your average layperson would speak, I would be partial. I mean, she asked, can you be impartial? And he then said, according to the transcript, I would be partial. It's possible he said impartial, but again, we're stuck with the transcript, and it does say partial. Even on that grounds, there's ample reason for the Court to affirm here. Your Honor, in the recent Supreme Court decision in Skilling, which we noted in our 20HA letter, the Court said that the defense counsel – counsel's lack of objection to a juror is strong evidence that that counsel was convinced that there was no bias. Because otherwise, if a counsel could do what happens here, counsel could lay in the weeds, undermine – the challenge system would be undermined as counsel could simply lay in the weeds, let the case go ahead, see whether or not he liked the result, and then have this sort of ace in his pocket to bring out later on appeal. And that's just not really appropriate. I wanted to respond to both the counsel's comments and to the reply brief in regard to the plain error standard, and specifically focusing on the fourth prong of plain error. While counsel did correctly cite, I believe it was, a concurrence or dissent from a decision not to grant en banc review, I think it was the Rodriguez case from 2005, which said there were no cases that found that a structural error could satisfy the fourth prong. The following year, I'd like to bring to the Court's attention, in the following year, the Eighth Circuit actually did find such a situation. And that was in a case called Rahn, R-A-H-N, v. Hawkins, at 464 F3rd 813. And in that case, the Court did find that there was a structural error. What happened there was the judge did not allow that. What was the last F3rd what? Oh, I'm sorry, Your Honor. F3rd, page 813. Yes. And the specific portion is at 818 to 820. And that was the Eighth Circuit from 2006. Obviously not binding here, but given that the argument's been made that it's, quote, hard to imagine the situation and there's no case, well, here is a case. That judge gave the parties too few parameters. The Eighth Circuit said that's a structural error. The Eighth Circuit said many circuits have found that automatically satisfies the third prong, the Rosillo case, which counsel cited in his reply was actually cited as one of those. But the Court went on and said we don't need to look at that because the fourth prong is not satisfied. And the language the Court used there is very applicable in this situation. It said, we do not wish to create incentives for parties to delay pointing out manifest errors to a district court. Were we to reverse here, parties would have an incentive to sandbag a trial court, knowing that they could obtain a new trial if things did not go their way on the merits. We think that this type of strategic behavior would expose the judicial process to scorn and ridicule. Well, I submit, Your Honors, that is exactly the type of situation here. I'm not faulting counsel for that. He was not present during the trial. We don't have trial counsel here. But the parties should just not be permitted to see it an issue, let it go, let the juror sit, have the whole trial be conducted, and then come back years later and say, oh, well, that juror, I really suffered this terrible bias because that juror was on the jury. It's a very different situation where counsel uses the proper method to have a juror removed and is not allowed, is rejected by the Court. Then the defendant, then the party is forced to have a juror they don't want on the jury. That is not this case. And, Your Honor, also, in regard to the fourth prong, the Rossio case, Ninth Circuit case,  I believe said that the evidence was not overwhelming, but here, as pointed out in our brief, the evidence was overwhelming. There was a series of witnesses, insurance beneficiaries and doctors, over and over again testifying that they did not get these prescriptions, they did not go to these doctors, the doctors did not see the patients. There was ample evidence of fraud here. In face of that overwhelming evidence, it would be inappropriate if a plain error is applied to find that the fourth prong has been met. Let's suppose somebody steals money, rob a bank, defrauds somebody, it doesn't matter, you get some ill-gotten gain. You then pay yourself, basically. You put it in your checking account. Is that money laundering? I'm only hesitating, Your Honor, because I think we would need to know the sequence that the funds travel through. If the money goes directly from a victim into your checking account, there would be a merger problem. Go to the bank, fill up a bag full of money, and you go down to the next bank and deposit it into your checking account. First of all, I'm not sure that the underlying offense would necessarily qualify as a specific unlawful activity under the statute. Bank robbery. But I understand the Court's question in the bank robbery, if the bank robber simply takes the proceeds and deposits them. I think that Santos and Van Alstyne noted that there was a potential problem with that type of money laundering charge, where it was simply depositing the proceeds. You know, this guy... But that's not what happens here, though. Well, this guy files fraudulent insurance claims. They put the money into his checking account or into his pharmacy account. He then basically pays himself and puts it into his own account. What's the difference there? The difference is that the money belongs to the pharmacy. The insurance companies or benefit managers paid the pharmacy. The money is now in the pharmacy bank account. At that point, the crime is over. The fraud has been completed. He could have left the money there. He didn't need to do anything else to carry the fraud out. When the money is taken out of that account by individual people and moved to their own bank accounts, that's a separate, distinct transaction, and that's why... I don't see how that's different than taking the money from the bank and taking it right, you know, once the robbery is committed, the robbery is committed, it's a done deal, and then taking that money and depositing it into another bank. Well, I do think that in that situation, I think that that type of activity could still qualify even under Santos and Ben Alstein, but the court need not go there because here there is an extra layer. The money was already in a bank. There was an entirely separate transaction of moving the funds from one bank to another after the crime was completed. So while the question the court raises I think still would qualify, you don't have to go that far. Here there was a separate transaction. It should be noted, too, that in this issue of... I'm not sure I understand. If they had mailed the check to this guy, if the insurance companies had mailed him a check instead of doing a direct deposit, and he takes the check to the bank and deposits it into his personal account, would that be money laundering? I think in that situation the defendant would have a good argument that it was not. I'm not conceding that it wouldn't necessarily be, but here's the problem. If he gets a check, he somehow has to turn that into some kind of money that can be used in some way, just the check by itself. He might not be able to do anything with that. So I think there could be a closer question on merger as to whether the mere cashing of the check or depositing it alone would be sufficient. I think it would, but I think it's a much closer question. The court, again, doesn't need to go there here because it was deposited in a bank account and we did not charge that. I don't see anywhere in the statute that says if it's deposited in a bank account it's money laundering, but if it's not, it's not. It talks in terms of financial transactions, which can be purchases. It can be anything. That's entirely right. I don't know where you're coming up with this. It's got to be a direct deposit in the bank. That's something you've just cooked up with all due respect. Well, Your Honor, I think we're forced to by the decision in Santos and Van Alstyne, which go in addition to saying it has to be profits, they also talk about the problem being merger. And the issue is when you're looking at merger, you have to look at to what extent there's overlap between the underlying crime and the transaction with the money. And that's, I think, what I'm trying to unravel. But the core of Santos and Van Alstyne really is, is it profits? And here it clearly was. This money was left over in the pharmacy bank account after they paid for drugs, after they paid rent, after they paid whatever expenses. The mere fact that they were taking the money out themselves doesn't make it an expense. It was the profits of their scheme. And, in fact, that bank account was in the name not of Ha or Huang. It was in the name of Ha's mother. And that was why it was disguised there was concealment going on. So this wasn't a situation where Ha necessarily personally got the money and then doled out the shares as noted in that footnote in Santos. Here it was in the pharmacy bank account. Some of it went to Ha, some of it went to Huang. And so in both situations it was the person getting their loot. And so I think it meets the Santos test. And, Your Honors, I note that the, as to, as counsel pointed out, accounts 20 through 24 where the money laundering involves the funds going to Ha himself. It's clear there that that falls within the scope of, excuse me, the footnote in Santos. And that was Ha getting his share of the loot. So it's clear that that fits within it. And I think the evidence shows that when Huang got her share, that also satisfies it. Thank you. Mr. Coleman, you've got about almost three minutes left. Thank you, Your Honor. On the juror bias issue, the government's, I think, essential argument is wavering. That you can never have a claim of juror bias if you didn't make a motion to strike for cause. And that's just not the law. I mean, there is no waiver here. At best for the government, it's forfeiture, and you apply a plain error test. Their entire argument is that the defense attorney must have made a strategic call not to strike him. But there's nothing to reflect that, that it wasn't inadvertence. The government also claims that, well, maybe the defense attorney wanted him because he had the prior conviction. But the bottom line is that the courts have a substantive duty to keep jurors off the panel for whatever biases, whether it's pro-defense or pro-government. And this juror had biases. Maybe he had some, although he specifically said that his prior conviction wouldn't affect his ability to judge the case. Whether he had that baggage in his past, the bottom line is that if a juror expresses partiality bias, he needs to be stricken. The court has a substantive duty. Judge Hall indicated, well, maybe the juror meant to say I would be impartial instead of I would be partial. Our position is number one, and I think it's dangerous to start changing the record, the record says what the record says. But to reinforce his partiality, he says I would be partial. I understand this is a monetary, that was more of a life-threatening situation, which I believe is the same. I understand the differences in the case, but I would be partial. The court follows up. This has to do with the guilt or innocence of the charges that were read off. And so the question is whether or not that experience or your practice is going to affect your ability to gauge the evidence in the case. And he says it would affect it. So I don't think you can read this as him saying I would be impartial. The judge immediately follows up after he says I would be partial, and he says yes, my personal experience would affect my ability to judge the case. Mr. Coleman, the difficulty, if you have it, and I can only speak for a third of the court, the difficulty is that his partiality was spelled out. Everybody knew the area in which he was partial. He even gave the reasons. He told what had happened to his niece. And so his kind of partiality was spelled out, and it certainly doesn't go to the point you wish it did. Now, I don't mean to say we've decided that it doesn't. He did say I would be partial. He did say I would be biased. He did say. He said all the things you said he said, and he said exactly why and the area in which you agreed. And doesn't that matter? I don't think it matters because of this. It's hard for someone to explain bias. I mean, bias is something that's inherently irrational. If I tell you I'm biased, and you say, well, how, and I give you my explanation, and you look at it and say, well, the explanation doesn't make any sense. It's irrelevant. The problem isn't bias. It's irrationality. Or you can say it doesn't go to anything that's going to be involved in this case. Well, number one, I don't think that's the case. He's saying I'm suspicious of pharmacists. I don't think they fill their prescriptions correctly. I double-check them. You know, I watch them like a hawk. I mean, that's what this is about. This is about fraudulent prescriptions. And he's saying I don't trust them. They don't do it right. So I think it is related to the facts of this case. But even if it weren't, the bottom line is that bias is bias. It's not always something that you can logically explain that someone's going to be convinced that your position somehow is logical and correct. It's that I am a partial person in this case. It's not the right case for me. And the judge had a sua sponte duty to say, you know, Mr. Kaplan, maybe there's another one that would be better for you. I guess what makes the case unusual is, you know, we see jurors all the time who will say they have animus against blacks or Jews or Mormons or aliens. You rarely see one where somebody says I have a long-seated, deep-seated hatred of pharmacists. We don't see that every day. I agree. I hate pharmacists. I hate their children and I hate pharmacists. But everyone has their own biases. Thank you very much.
judges: Farris, Hall, Silverman